The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Cramer. The appealing party has not shown good grounds to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a Pre-trial Agreement and at the hearing as
 STIPULATIONS
1. The parties are subject to and bound by the North Carolina Workers' Compensation Act.
2. An employee-employer relationship existed between plaintiff-employee and defendant-employer.
3. Hartford Accident Indemnity Company provided the workers' compensation insurance coverage for the employer.
4. Plaintiff sustained a compensable injury on January 27, 1994.
5. An Employer's Report of Injury to Employee was completed on February 14, 1994.
6. A Form 18 Notice and Claim dated April 30, 1994 was filed with the Industrial Commission on May 9, 1994.
7. A Form 33 Request for Hearing dated May 31, 1995 was filed with the Industrial Commission on June 5, 1995.
8. A Form 33R Response was dated July 26, 1995.
9. This case was ordered to Mediated settlement conference, which was held, and the case was not settled.
10. Plaintiff filed a Motion for Medical Treatment dated April 21, 1997.
11. Defendants filed a Motion dated May 23, 1997.
12. An Order was entered on July 7, 1997 by Becky A. Beane, Special Deputy Commissioner, denying Plaintiff's Motion, and ordering defendants to pay the expenses of an evaluation by Dr. Sutej with North Carolina Baptist Hospital.
13. Plaintiff's average weekly wage is $282.
14. The following depositions were taken post-hearing and the transcripts were received by the Industrial Commission on the dates shown: Glenn McCain, M.D. (July 6, 1998); Seymour Halleck, M.D. (July 13, 1998); Richard Gross, Ph.D. (July 22, 1998); Robert Wodecki, M.D. (August 5, 1998); Thomas Craig Derian, M.D. (August 25, 1998); and Robert Elkins, M.D. (September 4, 1998). By order of the Deputy Commissioner filed November 13, 1998, the parties were notified of all deposition transcripts received and expert witness fees were set, to be paid by Defendants. After having difficulty locating Dr. Jorge Asconape, who had relocated to Indiana, the parties were allowed to take his deposition via telephone on December 18, 1998 and that transcript was received on December 29, 1998. Finally, the transcript for the deposition of Lisa Anderson, taken July 7, 1998 was received on January 14, 1999. All the foregoing deposition transcripts were received into evidence.
15. Although the evidentiary record was initially closed by the Deputy Commissioner in January 1999, it was reopened because deposition transcripts had not been received by the Commission. The deposition transcripts for Katharine Byerly, Steven Propst, and Walter Davis, M.D. were thereafter forwarded to the Commission and were made a part of the evidentiary record.
 * * * * * * * * * * *
The Full Commission adopts the findings of fact found by the Deputy Commissioner and finds as follows
 FINDINGS OF FACT
1. Plaintiff was 43 years of age on the date of the hearing. She worked for defendant-employer for about ten and one-half years. She worked for about six and one-half years in cost accounting. When plaintiff's daughter was diagnosed with cancer in January 1992, plaintiff took a leave of absence from work for about nine to ten months, from January 1992 until October 1992. Upon her return to work, she was reinstated in cost accounting. On February 22, 1993, she was moved into the purchasing department.
2. On March 17, 1992, plaintiff was seen by her family doctor at Mountain View Medical Center with complaints of lower back pain and urinary frequency. She was diagnosed with a mild lumbosacral strain. She called the next day with complaints of nausea. The Medical Center's message log shows that she had taken her daughter for chemotherapy that day.
3. Plaintiff returned to her family doctor at Mountain View Medical Center in November 1992, with complaints of ongoing gastrointestinal problems, including stomach cramps, and pain radiating into her back. An upper GI evaluation done on November 5, 1992 was normal revealing no evidence or ulcers or inflammatory bowel disease.
4. At her examination with her family physician on November 28, 1992, her abdominal examination was benign. Her physician advised her that her stomach problems were most likely caused by her stress, particularly due to her daughter's cancer. Plaintiff was internalizing stress in her life.
5. On January 27, 1994, plaintiff was walking to the plant office after punching in when she slipped and hit her forehead on a steel beam. She did not lose consciousness. Plaintiff was taken to see Dr. John Bond at Wilkes Surgical Associate, P.A., where she was assessed with a contusion and hematoma. Plaintiff was given Tylenol for pain.
6. On follow-up, plaintiff complained of headaches, and Dr. Bond ordered x-rays and a CT scan of her head, which were completed on or about January 31, 1994. These tests were normal with no indication of any fracture, mass, hemorrhage, or other destructive changes.
7. On February 3, 1994, Dr. Bond advised plaintiff to increase her activity at home and initially released her to return to work as of February 7, 1994. At her next visit on February 9, 1994, plaintiff complained of dizziness, and head and neck pain. Dr. Bond assessed a cervical strain secondary to her head injury and started her on physical therapy. X-rays of the neck done shortly thereafter were negative.
8. When Dr. Bond attempted to examine her on February 16, 1994, plaintiff made multiple complaints and showed signs of anxiety. She began to cry and complained that she could not breathe. Dr. Bond noted that her CAT scan and x-rays were negative. He was of the opinion that she might have headaches for a while, but that a work hardening program would be appropriate.
9. Because of her ongoing complaints, plaintiff was evaluated by Dr. David Gower, a neurologist. Dr. Gower examined plaintiff on February 23, 1994 and ordered an MRI scan of her head and cervical spine. The MRI was negative and Dr. Gower reviewed her prior studies. Dr. Gower found no evidence of cranial trauma, and no indication that plaintiff had any memory problems. Dr. Gower found no evidence of a neurosurgical problem. He released her to return to work as of February 28, 1994.
10. Dr. Gower evaluated plaintiff on this occasion only and he did not assume her care. This is made clear in his letter of February 23, 1994 to Gail Murison, which was copied to Dr. Bond. The testimony of Katharine Byerly, a claims adjuster with Hartford Insurance, that Dr. Gower had become plaintiff's treating physician, is not supported by the greater weight of the evidence, which shows he conducted a one-time assessment only.
11. On February 27, 1994, plaintiff went to the emergency room at Wilkes Regional Medical Center complaining of chest pain. A chest x-ray was normal and an EKG showed no acute changes. Plaintiff was assessed with costochondritis, given Naprosyn, and taken out of work for two days. There is no medical evidence to connect plaintiff's complaints on this occasion to her compensable head contusion of January 27, 1994.
12. Following her evaluation and release to return to work by Dr. Gower in February 1994, plaintiff continued follow-up with Dr. Bond. He continued to treat her conservatively. Although he had previously released her for a return to work, due to her ongoing complaints, he kept her out of work through almost all of the month of March 1994. As of March 30, 1994, Dr. Bond planned a gradual return to work, beginning with two hours per day for three days, followed by six hours per day for a week, and then an eight hour day.
13. There is no documentary evidence to indicate that continued treatment by Dr. Bond would not be authorized by Hartford until Katharine Byerly's letter of March 29, 1995 addressed "To Whom It May Concern" at Wilkes Surgical Associates. That letter refers to charges on a Form 25M, but it is not clear from the evidence when those charges were incurred.
14. Plaintiff returned to work for Ithaca Industries on or about March 31, 1994, in the same position as before in the purchasing department. She was paid an hourly wage. Plaintiff was able to carry out her duties without any hindrance from her injury. In February 1994, plaintiff received a four-percent pay raise following a performance review.
15. Defendants accepted plaintiff's injury as compensable and paid for plaintiff's initial medical treatment with Dr. Bond and her evaluation by Dr. Gower. Katharine Byerly prepared a Form 21 and tendered it to plaintiff, but she refused to sign. As set forth in the Form 28B filed with the Commission on May 12, 1994, defendants paid plaintiff compensation benefits totaling $805.72 for four and two-sevenths weeks from January 31, 1994 through February 27, 1994. Defendants did not pay plaintiff for her time when Dr. Bond kept her out of work past February 27, 1994 and into March 1994.
16. On May 17, 1994, plaintiff on her own sought evaluation of her eyes by Bryan Allf, M.D. at Western Carolina Eye Associates. She complained of headaches and eye pain. Dr. Allf found no condition requiring his treatment. However, due to plaintiff's complaints, he referred her for evaluation by Dr. Jorge Asconape, a neurologist.
17. On May 25, 1994, plaintiff saw Dr. Asconape. Both this visit and the visit to Dr. Allf were without any prior approval from defendant-carrier. Dr. Asconape's neurological examination of plaintiff was unremarkable. He found her cranial nerves intact. Plaintiff had good strength in all her extremities and a good range of motion in her neck. Dr. Asconape found some cervical contracture on the right side of the neck and assessed plaintiff with a probable cervical strain. He prescribed physical therapy and Amitriptyline.
18. Dr. Asconape saw plaintiff again on July 13, 1994. At that time, her condition was improved and he believed her cervical strain was resolving. He released her from his care, and advised her to see him again in two months only if her symptoms persisted. Plaintiff did not return to see Dr. Asconape until June 7, 1995.
19. After returning to work for defendant-employer on or about March 31, 1994, plaintiff gradually increased her hours and by April 13, 1994, she was working six hours per day. When she saw Dr. Bond that day, he noted she was scheduled to begin working eight hours per day the next day. Plaintiff then began working a regular full time schedule.
20. On December 1, 1995, plaintiff was promoted from an hourly to a salaried position. She was no longer expected to punch a time clock. Her new salary was $17,000 per year. Plaintiff received another pay increase on August 1, 1996, with a new annual salary of $18,807.
21. Plaintiff continued to see Dr. Bond periodically throughout 1994 and continuing into 1996. She continued to complain of cervical pain, radiating into the scapular area. However, her physical examinations consistently showed good range of motion. She had complaints of some tenderness when pressure was applied in the cervical area, which is a somewhat subjective finding.
22. On November 17, 1995, plaintiff went to see Dr. Bond with complaints of increasing pain in her right shoulder area. She was crying and acting very apprehensive when Dr. Bond examined her. He found no neurological deficits and no objective explanation for her pain complaints.
23. Plaintiff came back to see Dr. Bond just three days later on November 20, 1995 complaining of a sudden onset of pain in the right side of her head that started on November 13, 1994 and had worsened. Dr. Bond was aware that plaintiff had seen Dr. Asconape in May 1994, and suggested she go back for further evaluation. At this time, it appears that plaintiff did not tell Dr. Bond that she had seen Dr. Asconape as recently as August 1995.
24. When plaintiff returned to see Dr. Asconape on June 7, 1995, she had not seen him for almost a year. She told Dr. Asconape that her symptoms had persisted since July 13, 1994. She continued to complain of headaches and cervical pain, but did not complain of any diffuse pain or other specific tender points of pain in her body. Dr. Asconape's physical examination was essentially unchanged. There were no real findings to explain her complaints, other than tenderness, which is somewhat subjective.
25. Dr. Asconape commented that it is generally unusual for someone to continue to experience headaches and neck aches so long after a minor trauma, such as plaintiff's head contusion. Under the circumstances, Dr. Asconape did not think plaintiff's pain complaints were causally related to her January 1994 head injury. Dr. Asconape suspected these symptoms might be caused by depression and started her on an anti-depressant medication. She was initially given Zoloft, but due to a negative reaction was given Paxil instead.
26. When plaintiff saw Dr. Asconape in follow-up on August 16, 1995, she complained of significant stress at work. Despite her complaints, she was better and the Paxil was helping her. She was able to work a full day. Dr. Asconape found her examination to be essentially unchanged.
27. When Dr. Asconape next saw her on November 22, 1995, just two days after her visit to Dr. Bond, plaintiff complained of new symptoms, including pain in her right upper extremity, radiating down into her back. Plaintiff reported that her entire right side had been paralyzed and she could not move it. She moved with difficulty and appeared to be in great distress. Dr. Asconape found no organic basis for plaintiff's complaints and suspected the cause was psychogenic.
28. Despite the lack of objective findings to support plaintiff's complaints, Dr. Asconape ordered an MRI of the cervical spine and a CT head scan, which were done on November 28, 1995. The results of both tests were normal. These results reinforced Dr. Asconape's assessment that plaintiff's pain complaints were due to psychogenic factors. He suspected that her cervical muscle spasm was due to stress and that her right-sided weakness was due to a conversion reaction. At this time Dr. Asconape believed plaintiff had a developed a significant psychiatric problem.
29. From 1992 and continuing, plaintiff had many personal difficulties, which created stress in her life. In 1992, her daughter was diagnosed with cancer. Sometime in 1995, plaintiff's grandmother, to whom she was very close, died. Her marriage was also disintegrating during this time, and her husband was involved in an adulterous affair. Around July or August 1996, plaintiff's husband moved out. At the same time her husband left her, her mother was very ill.
30. At a July 26, 1996 appointment with Dr. Asconape, plaintiff reported that her husband had left her, which led to an increased level of anxiety. Dr. Asconape had already placed her on anti-depressant medication in 1995. At this point, he recommended psychological treatment.
31. In her domestic complaint filed against her husband, plaintiff alleged that he had treated her with indignities, shouting and cursing at her for no reason and that he had a violent temper, and had caused property damage in the marital home, threatened her, and engaged in an adulterous sexual relationship with Pamela Church. Plaintiff subsequently filed a civil action against Pamela Church alleging criminal conversation and alienation of her husband's affection and seeking compensatory and punitive damages.
32. After being made aware of the allegations that plaintiff made against her husband in her civil complaint, in his deposition testimony, Dr. Asconape acknowledged that these events were certainly important factors in the development of the symptoms plaintiff was manifesting during this time.
33. During her treatment with Dr. Asconape, plaintiff did not report symptoms that would suggest fibromyalgia and Dr. Asconape did not diagnose that condition or refer her to a rheumatologist. He did not relate her physical symptoms to her head contusion of January 1994.
34. Plaintiff was sent by defendant-carrier for an independent medical evaluation by Dr. Robert Elkins, an orthopaedic surgeon, who examined her on October 15, 1996. During her examination, plaintiff demonstrated inconsistent behavior. She stood without problems, but when asked to rise from the examining table to a standing position, she went through a great deal of difficulty. She moved very slowly with a pained expression on her face and demonstrated a gait, which Dr. Elkins termed "bizarre". He found inconsistent decreased sensations in the right leg and foot and left ankle. Plaintiff complained of tenderness out of proportion to the light pressure Dr. Elkins applied when touching her back during the exam. Dr. Elkins noted multiple positive Waddell's signs, which are classic indications of symptom magnification and pain accentuation.
35. Dr. Elkins performed an examination developed by the American College of Rheumatology to determine tender points identified in fibromyalgia. Although plaintiff was tender in some of the eighteen points identified, she complained of being tender all over, including three control points, which should not have been tender. Dr. Elkins concluded that plaintiff did not meet the criteria for fibromyalgia.
36. Dr. Elkins' examination showed no physiologic basis for plaintiff's complaints. He found no physical reason plaintiff could not perform a sedentary job for a full eight-hour day. Dr. Elkins recommended a psychiatric evaluation.
37. On December 5, 1996, plaintiff on her own sought treatment from Dr. Robert Wodecki, a specialist in internal medicine and rheumatology in Statesville, North Carolina. Dr. Wodecki concluded that plaintiff met the criteria for fibromyalgia. The criteria he outlined are chronic pain of at least three months duration and identification of specific tender spots both above and below the waist. Fibromyalgia is often triggered by an emotional state such as stress, and is not by definition associated with trauma. Dr. Wodecki was of the opinion that her injury in January 1994 played some role in her development of the condition. Dr. Wodecki recognized a component of depression in plaintiff's condition. However, he was unaware of plaintiff's stress-related ailments going back to 1992. Dr. Wodecki sent plaintiff to a pool therapy program beginning in December 1996.
38. At her attorney's request, plaintiff was examined by Dr. Thomas Craig Derian, an orthopaedic surgeon, who saw her on March 1, 1996. Plaintiff told Dr. Derian that she had pain all over her body, which had begun about four months ago. She did not specifically relate it to her January 1994 accident.
39. During his examination, Dr. Derian noted inconsistencies in plaintiff's behavior and marked pain behavior. Plaintiff had diffuse tenderness and withdrew from even light palpation, an indication of an anxious psychiatric response rather than a genuine pain response. A person with a legitimate physical problem is more receptive to examination by the physician. While she was being examined, plaintiff moved slowly, but otherwise moved about normally. When she was asked to walk while being observed, she moved very slowly, but otherwise when she was not being observed, she had a normal gait. Plaintiff had a flat affect, meaning she did not respond as would be expected, a possible sign of depression. Overall, plaintiff's behavior was very unusual and was consistent with psychological problems.
40. Dr. Derian concluded that plaintiff was not suffering from fibromyalgia. He found no indication of any physical cause for her complaints of pain, and concluded that her symptoms had a psychological basis. Dr. Derian suggested to plaintiff that she seek psychological treatment. Her response was that she did not need such treatment.
41. Additionally, at the request of her attorney, plaintiff was examined by Dr. Glenn A. McCain, who specializes in rheumatology. Dr. McCain examined plaintiff on May 13, 1997. Plaintiff told him that Dr. Wodecki had diagnosed her with fibromyalgia. After examining plaintiff, Dr. McCain agreed with the assessment of fibromyalgia. However, he could not determine whether plaintiff's head contusion of January 1994 was causally related to her subsequent development of fibromyalgia. In particular, Dr. McCain noted that a significant period of time passed after the accident before plaintiff developed the symptoms of fibromyalgia. Despite his assessment of fibromyalgia, Dr. McCain acknowledged that the criteria for fibromyalgia can be seen in patients with a psychiatric condition known as a somatoform disorder.
42. Plaintiff was also examined by Dr. Paul Sutej, a specialist in internal medicine and rheumatology, who saw her on July 7, 1997. Dr. Sutej found her symptoms consistent with a diagnosis of fibromyalgia, and assessed her with a chronic pain syndrome. However, he could not make a causal connection between plaintiff's injury of January 1994 and her pain syndrome.
43. On May 12, 1997, plaintiff was examined by Dr. Walter Davis, Medical Director of the Spine and Occupational Rehab Center at North Carolina Baptist Hospital. Dr. Davis found plaintiff put forth a poor effort during the examination, and showed give-way weakness, an indication of a non-organic basis for her complaints. Despite this behavior, he found she had normal strength in all muscle groups and normal sensory exam and normal deep tendon reflexes in all four extremities. The cranial nerves were intact. Dr. Davis found no evidence of any neurologic impairment and no physical basis for her pain complaints. He noticed a great deal of behavior to indicate that plaintiff's complaints stemmed from non-organic or psychological causes.
44. Plaintiff began the rehabilitation program at the Spine and Occupational Rehab Center, but she was non-compliant. Her behavior made it difficult for them to test her accurately or render effective treatment. Dr. Davis was concerned that her exaggerated behavior, such as falling against a wall or leaning back in a chair suddenly, would result in further injury. She was released to return to full work duty on May 16, 1997. At that time, Dr. Davis believed she was capable of working a full eight-hour day on a sedentary level.
45. At defendant-carrier's request, Dr. Seymour Halleck, a forensic psychiatrist, examined plaintiff. Dr. Halleck is board-certified in psychiatry and neurology. He held many positions at the Medical School of UNC-Chapel Hill until his semi-retirement in 1995. Dr. Halleck is a reputable psychiatrist with impressive credentials. His evaluation of plaintiff and his testimony is reliable and persuasive.
46. On December 18, 1996, plaintiff and her sister reported to Dr. Halleck's office. The interview was difficult for Dr. Halleck due to plaintiff's lack of cooperation. She was not willing to reveal any personal or intimate details of her life to Dr. Halleck, to the point that Dr. Halleck commented that it was extremely rare to encounter someone so resistant. Plaintiff did not want to participate in any type of psychiatric evaluation and became irritable with Dr. Halleck during the interview. She refused to acknowledge or accept any psychological basis for her complaints.
47. Although plaintiff acknowledged that her husband had left her in 1996, she refused to discuss it further with Dr. Halleck. He concluded that it was probably a very traumatic experience for her. Such an experience could make her feel more dependent and helpless. Since she had been experiencing her pain symptoms, plaintiff had received a lot of attention from family members, particularly her daughter and her sister. Dr. Halleck noted that this attention and care she was receiving seemed to be reinforcing her such that she desired to stay in the sick role.
48. Dr. Halleck found plaintiff's cognitive functions to be intact. She expressed her thoughts in a logical and coherent manner. Plaintiff performed well on his tests for memory function and concentration. However, when Dr. Halleck asked her questions about her personal life, she often responded that she could not remember.
49. At the conclusion of her interview with Dr. Halleck, a strange incident occurred when plaintiff said that she could not get out of the chair. Although plaintiff had made no complaints of any physical difficulties or paralysis during the entire interview, she now acted paralyzed. It took Dr. Halleck almost an hour to arrange for an emergency rescue team to come and move plaintiff a distance of approximately fifty yards to the UNC Memorial Hospital emergency room. At the emergency room, the physicians who examined her could find no physical reason for plaintiff's complaints of weakness or inability to ambulate.
50. Dr. Halleck concluded that plaintiff's pain complaints were based on psychological factors. Plaintiff had pre-existing psychological needs, and after her minor head contusion, she began exaggerating her symptoms. Although the injury may have precipitated her initial complaints, the cause was multiple underlying needs. Plaintiff developed an exaggerated pain response, which was exacerbated by the stress of her personal life, including her daughter's cancer, her mother's illness, and the breakup of her marriage.
51. Dr. Halleck's final diagnosis was that plaintiff was suffering from a pain disorder associated with psychological factors, a somatoform disorder as defined by the Diagnostic and Statistical Manual of Mental Disorders IV (DSM-IV). A somatoform disorder is characterized by a difficulty in bodily function, which can not be explained by any physiological or anatomical basis. The psychological factors, which were not related to plaintiff's employment, were the most significant factors in the development of her pain disorder.
52. On February 27, 1997, plaintiff was evaluated by Thompson Gross, Ph.D., a clinical psychologist, who specializes in chronic pain and rehabilitation. Dr. Gross evaluated her for the purpose of determining whether an outpatient rehabilitation program offered at Baptist Hospital would be appropriate. The testimony of Dr. Gross is supported by other evidence of record and is credible and persuasive.
53. Dr. Gross had an experience very similar to that of Dr. Halleck in his attempt to interview plaintiff. She was purposefully vague, and was not forthcoming with private details of her life. She became irritable with Dr. Gross when he tried to question her. Plaintiff denied that her illness was having any negative impact on her family. She seemed unconcerned that her daughters were caring for her. Dr. Gross noted that plaintiff seemed to be comfortable in the role of being disabled and for whom others had to provide care.
54. During her interview with Dr. Gross, plaintiff also demonstrated what he termed "dramatic pain behavior". When she got ready to leave the office, she was staggering and grabbed the wall for support, gasping for breath.
55. Dr. Gross reached conclusions consistent with those of Dr. Halleck. He found that plaintiff had a pain disorder secondary to medical and psychological factors. He was of the opinion that her pain behavior was influenced primarily by psychological rather than physiological factors.
56. Plaintiff entered the functional restoration program under the direction of Dr. Gross, but only participated for five days out of a planned three-week program. During the few days she was there, plaintiff was not compliant with the program, and would not participate in some of the physical activities required, although there was no physical reason she could not perform these tasks. Plaintiff had been told to discontinue her use of pain medicines and muscle relaxants during her participation in the program, but apparently had not. Based upon her behavior and lack of compliance, Dr. Gross concluded that further physical therapy would not be of benefit. During this time, plaintiff was working a six-hour day. Dr. Gross noted that, despite her obvious pain behavior, plaintiff demonstrated the ability to work an eight-hour day at a sedentary job on a full time basis.
57. During this period from 1994 through 1996, plaintiff continued working full time for defendant-employer. Even if she was only at work for six hours during a day, by December 1995 she was salaried so there was no reduction in her wages. On December 4, 1996, Phil Hendrix began working for defendant-employer as a corporate purchasing manager, whose duties included supervising plaintiff's work. He monitored plaintiff's work and noticed that she was making many mistakes that were costing the company money. Beginning in February 1997, Mr. Hendrix kept a log in which he recorded performance problems with plaintiff.
58. One of plaintiff's job responsibilities was to order tags and labels used for garments, as well as boxes used to ship. In early February 1997, it was brought to Mr. Hendrix's attention that there were high inventories on labels that plaintiff had ordered. In one instance, she had ordered five times more UPC labels than were needed for a particular style. Shortly afterward, plaintiff had more OCR's than were needed for a shipment. In March 1997, she ordered tags in the wrong sizes for some particular items. In addition, in March 1997, plaintiff had 50,000 chipboard boxes sent to a facility when only 8,500 were needed. In April 1997, she improperly authorized the destruction of labels, which cost the company over $18,000.
59. During the spring of 1997, Mr. Hendrix's division was being reorganized. The purchasing responsibilities were to be reassigned. A decision was made that the staff would be cut from six to five and Mr. Hendrix was given the discretion whom to eliminate. He had the most performance problems with plaintiff and so made his decision based upon these ongoing problems. As part of the reorganization, plaintiff was terminated on July 18, 1997. Her termination was based upon reorganization and poor performance and was unrelated to her injury by accident of January 1994.
60. The plaintiff's demeanor and responses to questions at the hearing as observed by the Deputy Commissioner were consistent with the observations made by many of the physicians as well as Dr. Gross, the clinical psychologist, who examined her. At the hearing before the Deputy Commissioner, plaintiff demonstrated exaggerated facial expressions to emphasize pain, and moved very slowly as if to convey difficulty. However, her movements did not appear to be due to genuine difficulty or discomfort. Her answers to questions she did not favor were often evasive or vague. Plaintiff was not a candid or credible witness.
61. The greater weight of the evidence establishes that plaintiff's injury by accident on January 27, 1994 was a mild injury to her forehead, which caused a contusion and bruising. There was no cognitive injury and no neurological injury. Plaintiff sustained a mild cervical strain and some headaches, but no permanent impairment due to this injury. The physicians who have examined her in the years since have been unable to find any objective basis for her ongoing complaints of pain and occasional paralysis.
62. Due to her injury by accident of January 27, 1994, plaintiff had some neck pain and headaches for the next two months, which interfered with her ability to perform her work on a daily basis. As authorized by her treating physician at that time, Dr. Bond, plaintiff was unable to perform the duties of her employment and was temporarily totally disabled from the date of her injury through March 30, 1994. Although defendants paid plaintiff compensation for part of this period, no compensation was paid for any time after February 28, 1994, a period during which Dr. Bond had authorized her to remain out of work.
63. After her compensable injury by accident, plaintiff developed a somatoform disorder, which was not caused by her head injury. This disorder was caused by pre-existing underlying psychological factors, including dependency needs. Even if the plaintiff's accident may have triggered the onset of symptoms, the accident was not the cause. The underlying emotions and stressors, which caused the reaction, were not related to plaintiff's employment. Plaintiff's somatoform disorder is the cause of her ongoing pain complaints.
64. One component of this disorder was a conversion reaction, in which plaintiff manifests various physical symptoms, such as her claims of paralysis, for which there are no physical basis. This somatoform disorder can produce symptoms similar to those set out in the criteria for a diagnosis of fibromyalgia.
65. Although certain rheumotologists have assessed plaintiff's condition as fibromyalgia, other physicians who have examined her have concluded she does not have fibromyalgia. These physicians include Dr. Davis, a specialist in physical medicine and rehabilitation, Dr. Derian, an orthopaedic specialist, who performed an independent examination at plaintiff's request, Dr. Elkins, an orthopaedic specialist, and Dr. Halleck, a forensic psychiatrist. The testimony of these physicians is persuasive and is given more weight in assessing plaintiff's condition. When considering plaintiff's inconsistent behavior and exaggerated pain behavior, and lack of candor during almost all of her examinations by the physicians, the diagnosis of fibromyalgia is not reliable.
66. Plaintiff does not have fibromyalgia, and even if it should be determined that she does meet the criteria for the constellation of symptoms also known as fibromyalgia, this condition has not been shown to be causally related to her injury by accident. A significant amount of time passed between plaintiff's injury of January 1994 and her manifestation of trigger point pain complaints, a primary component of fibromyalgia. There is no close temporal relationship between the two. Further, fibromyalgia by definition, is more closely associated with psychological causes such as depression, than with traumatic injury.
67. The medical treatment rendered by Dr. Bond initially was appropriate to address the plaintiff's mild cervical strain and headaches. Defendant-carrier never notified Dr. Bond in writing that additional treatment would not be approved until March 29, 1995. Therefore, all treatment rendered by Dr. Bond to plaintiff up through that date was with the understanding that he was her treating physician, and should be approved.
68. Following her return to work in March 1994, plaintiff sought additional medical treatment from several providers without prior approval of the carrier, including Dr. Allf, Dr. Asconape, and Dr. Wodecki. The subsequent treatment she sought was not reasonably necessary to effect a cure, give relief, or lessen any period of disability. Moreover, treatment plaintiff sought after 1994 has not been shown to have any causal relationship to her injury of January 27, 1994. The treatment rendered for her alleged fibromyalgia and her ongoing pain complaints was not necessitated by her injury.
69. Plaintiff's injury of January 27, 1994 caused a mild contusion to her forehead and a mild cervical strain, which was resolving by July 1994. Her subsequent pain complaints were caused by her somatoform disorder, which is unrelated to her injury by accident.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as follows
 CONCLUSIONS OF LAW
1. As a result of her compensable injury by accident, plaintiff was unable to earn wages in the same or any other employment and was temporarily totally disabled from January 27, 1994 through March 30, 1994. Defendants, having only paid benefits up through February 27, 1994, are responsible for payment for compensation for the period of February 28, 1994 through March 30, 1994 at the rate of $188 per week. N.C. Gen. Stat. § 97-29.
2. Plaintiff has failed to establish that her injury of January 27, 1994, a head contusion and mild cervical strain, caused any additional period of disability after she effectively returned to work on or about March 31, 1994 and. N.C. Gen. Stat. § 97-29.
3. Plaintiff is not entitled to compensation for the consequences of the somatoform disorder, including her ongoing complaints of pain since plaintiff's subsequent development of a somatoform disorder was not caused by her compensable injury by accident. Even if the accident triggered some symptoms, it was not the underlying cause. N.C. Gen. Stat. § 97-2;Brewington v. Rigsbee Auto Parts, 69 N.C. App. 168
(1984).
4. Plaintiff is entitled to have defendants pay for Dr. Bond's treatment until March 29, 1995 since the medical treatment rendered by Dr. Bond was initially related to the compensable injury by accident. Furthermore, it was authorized by defendant-carrier that did not notify Dr. Bond of its disapproval until March 29, 1995. N.C. Gen. Stat. § 97-25.
5. Plaintiff is not entitled to have defendants pay for additional treatment plaintiff sought from various physicians, including Dr. Allf, Dr. Asconape, and Dr. Wodecki as such treatment was not for any conditions causally related to plaintiff's injury by accident. Although the initial treatment by Dr. Asconape in 1994 was related to the cervical strain, it has not been established to have been reasonably necessary to effect a cure, provide relief or lessen the period of disability. N.C. Gen. Stat. §§ 97-2(19) and 97-25.
6. Plaintiff was terminated from her employment due to poor job performance, reasons unrelated to her injury by accident. At the time of her termination, plaintiff was not under any disability due to her injury. Any subsequent diminution in her wage earning capacity was not caused by her injury by accident.Seagroves v. Austin Co. of Greensboro, 123 N.C. App. 228
(1996).
7. Plaintiff has failed to establish that she has suffered any loss of wage earning capacity following her termination due to her compensable injury. Plaintiff has failed to show that due to her compensable injury by accident she has sustained any physical or mental impairment that has rendered her incapable of earning wages in the same or any other employment. Hillardv. Apex Cabinet Company, 305 N.C. 593 (1982).
 * * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. Defendants shall pay plaintiff temporary total disability compensation at the rate of $188 per week for the period of February 28, 1994 through March 30, 1994. Such benefits having accrued are to be paid in a lump sum subject to a reasonable attorney's fee.
2. A reasonable attorney's fee of twenty-five percent of the compensation awarded and due plaintiff shall be paid to her attorney.
3. Defendants shall pay the medical bills incurred for treatment rendered by Dr. Bond until March 29, 1995.
4. Plaintiff's claim at this time for additional payment of medical expenses not previously authorized by defendants and unrelated to plaintiff's injury by accident is hereby, and the same shall be, Denied.
5. Plaintiff's claim for additional compensation benefits is hereby, and the same shall be, Denied.
6. Defendants shall pay the costs, including the expert witness fees previously approved and expert witness fees of $150 to Dr. John Bond, and $450 to Dr. Walter S. Davis, Jr., if not already paid.
This the ___ day of March 2000.
 S/ ____________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
S/ _____________ THOMAS J. BOLCH COMMISSIONER
S/ _____________ CHRISTOPHER SCOTT COMMISSIONER DCS/nwg